UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TONI YVONNE LANE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:17-cv-03320-JMS-TAB |
| | ) | |
| INDIANAPOLIS PUBLIC SCHOOLS, | ) | |
| | ) | |
| Defendant. | ) | |

## ENTRY

Plaintiff Toni Lane worked as a bus driver and bus attendant for Defendant Indianapolis Public Schools ("IPS"). Since her tenure with IPS began in 2014, Ms. Lane requested and, for the most part, received accommodations for various medical conditions. But in 2017, IPS terminated Ms. Lane for hitting a student's shoulder to wake him up. Ms. Lane brought suit, contending that IPS failed to accommodate her conditions during her employment and then fired her not for pushing the student, but due to her disability and out of retaliation for her accommodation requests. Several of Ms. Lane's claims fail for failure to exhaust administrative remedies because they were not raised in her May 2017 EEOC charge. Others fail for lack of evidence. Her failure-to-accommodate claim, however, survives in a very limited form. Therefore, as fully explained below, the Court **GRANTS IN PART** and **DENIES IN PART** IPS's Motion for Summary Judgment. [Filing No. 56.]

## I.
### LEGAL STANDARD

A motion for summary judgment asks the Court to find that a trial is unnecessary because there is no genuine dispute as to any material fact and, instead, the movant is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). As the current version of Rule 56 makes clear,

whether a party asserts that a fact is undisputed or genuinely disputed, the party must support the asserted fact by citing to particular parts of the record, including depositions, documents, or affidavits. Fed. R. Civ. P. 56(c)(1)(A). A party can also support a fact by showing that the materials cited do not establish the absence or presence of a genuine dispute or that the adverse party cannot produce admissible evidence to support the fact. Fed. R. Civ. P. 56(c)(1)(B). Affidavits or declarations must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on matters stated. Fed. R. Civ. P. 56(c)(4). Failure to properly support a fact in opposition to a movant's factual assertion can result in the movant's fact being considered undisputed, and potentially in the grant of summary judgment. Fed. R. Civ. P. 56(e).

In deciding a motion for summary judgment, the Court need only consider disputed facts that are material to the decision. A disputed fact is material if it might affect the outcome of the suit under the governing law. *Hampton v. Ford Motor Co.*, 561 F.3d 709, 713 (7th Cir. 2009). In other words, while there may be facts that are in dispute, summary judgment is appropriate if those facts are not outcome determinative. *Harper v. Vigilant Ins. Co.*, 433 F.3d 521, 525 (7th Cir. 2005). Fact disputes that are irrelevant to the legal question will not suffice to defeat summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On summary judgment, a party must show the Court what evidence it has that would convince a trier of fact to accept its version of the events. *Johnson v. Cambridge Indus.*, 325 F.3d 892, 901 (7th Cir. 2003). The moving party is entitled to summary judgment if no reasonable factfinder could return a verdict for the non-moving party. *Nelson v. Miller*, 570 F.3d 868, 875 (7th Cir. 2009). The Court views the record in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Darst v. Interstate Brands Corp.*, 512

F.3d 903, 907 (7th Cir. 2008). It cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 630 (7th Cir. 2011). The Court need only consider the cited materials, Fed. R. Civ. P. 56(c)(3), and the Seventh Circuit Court of Appeals has "repeatedly assured the district courts that they are not required to scour every inch of the record for evidence that is potentially relevant to the summary judgment motion before them," *Johnson*, 325 F.3d at 898. Any doubt as to the existence of a genuine issue for trial is resolved against the moving party. *Ponsetti v. GE Pension Plan*, 614 F.3d 684, 691 (7th Cir. 2010).

## II.
### BACKGROUND[1]

The following factual background is set forth pursuant to the standards detailed above. The facts stated are not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light most favorable to "the party against whom the motion under consideration is made." *Premcor USA, Inc. v. American Home Assurance Co.*, 400 F.3d 523, 526-27 (7th Cir. 2005).

### A. Hiring and Training as Bus Driver

Ms. Lane began working for IPS as a school bus driver on July 30, 2014. [Filing No. 56-2 at 5.] Bus drivers are responsible for monitoring and safely transporting students. [Filing No. 56-2 at 6; Filing No. 56-1 at 2.] When she was hired, Ms. Lane worked about 30 hours per week and was paid at a rate of $14.93 per hour. [Filing No. 56-2 at 5; Filing No. 56-2 at 7.] Ms. Lane

---

[1] The Court denies IPS's request to strike Ms. Lane's untimely appendix of exhibits. [Filing No. 77 at 2.] The Court does not condone Ms. Lane's failure to adhere to deadlines, particularly in light of the two lengthy extensions previously granted, and cautions Ms. Lane's counsel that it will expect scrupulous attention to deadlines during the remainder of this case. But Ms. Lane's evidence ultimately plays no role in resolving the lone claim that survives summary judgment, and IPS has failed to demonstrate prejudice from the late filing.

worked as an "on-call," or substitute, bus driver. [Filing No. 56-1 at 2; Filing No. 56-2 at 7.] On-call drivers were assigned routes based upon seniority. [Filing No. 56-2 at 7.]

Ms. Lane began her employment with about two months of training, which addressed IPS's harassment policies, equal employment opportunity policies, and student management policies, among other things. [Filing No. 56-2 at 6-8; Filing No. 56-1 at 2-3; Filing No. 56-1 at 10; Filing No. 56-3 at 2-9.] This included the following instruction: "Don't grab, push, slap, hit, or kick a child." [Filing No. 56-3 at 6; Filing No. 56-2 at 6.]

When IPS receives a request for disability accommodation, it schedules what it calls a "Section 504/ADA conference" with the ADA coordinator, the requestor, the requestor's supervisor, and anyone else who may provide information or expertise. [Filing No. 56-1 at 3.] After the conference, IPS identifies a possible accommodation for the requestor. [Filing No. 56-1 at 3.]

## B.  First Accommodation Request

Seven months in to her employment, Ms. Lane began feeling pain in her right shoulder from a rotator cuff injury she had suffered while driving a bus for her previous employer. [Filing No. 56-2 at 5; Filing No. 56-2 at 12-13.] Ms. Lane's doctor recommended that she stop driving. [Filing No. 56-2 at 5.] On January 28, 2015, Ms. Lane submitted a written request for accommodation, explaining that she risked reinjuring her rotator cuff if she continued driving. [Filing No. 56-3 at 11; Filing No. 56-2 at 12.] Ms. Lane submitted documentation from her doctor recommending that she no longer drive. [Filing No. 56-3 at 12-13.]

IPS held an ADA conference on February 11, 2015, to address her request for accommodation. [Filing No. 56-3 at 14-18; Filing No. 56-2 at 15.] Ms. Lane, a union representative, a human resources official, and the ADA coordinator all attended. [Filing No. 56-

1 at 4.]  On February 12, 2015, IPS approved Ms. Lane's accommodation request and transferred her to an on-call bus attendant position.  [Filing No. 56-3 at 18; Filing No. 56-1 at 4; Filing No. 56-2 at 16.]

### C.  Bus Attendant Position

Ms. Lane began her new position as an on-call bus attendant around February 15, 2015. [Filing No. 56-2 at 16.]  Bus attendants are responsible for monitoring students while on the bus, helping students cross the street, and making sure that all students leave the bus when it arrives at its destination.  As part of her position transfer, Ms. Lane's wage was reduced to $10.03.  [Filing No. 56-1 at 5; Filing No. 56-2 at 16.]

Dietra Shelton, vice president of the local union, represented IPS employee Adam Stamps in a negotiation with IPS and avers that Mr. Stamps was permitted to retain his driver's pay after transferring to a bus attendant position.[2]  [Filing No. 72-6 at 1.]  IPS records, however, indicate that Mr. Stamps was "[d]emoted due to excessive accidents in driving position" and given a pay reduction from $16.06 per hour to $12.22 per hour.  [Filing No. 76-1 at 5-6.]  No record evidence indicates whether Mr. Stamps suffered from a disability.

Sometime in August 2016, Ms. Lane, along with all of the other on-call bus attendants, was promoted to a regular, fixed bus attendant position.  [Filing No. 56-2 at 16.]  From that point on, IPS no longer employed on-call bus attendants.  [Filing No. 56-2 at 16.]  Bus routes were then assigned by a bidding procedure based upon seniority.  [Filing No. 56-1 at 5.]

---

[2] Ms. Shelton also avers that she is "aware" that other bus drivers have kept their pay after transferring to a bus attendant position, but also states that she "do[es] not have personal knowledge of these cases."  [Filing No. 72-6 at 1.]  Ms. Shelton's admitted lack of personal knowledge means that the Court may not consider this assertion on summary judgment.  *See* Fed. R. Civ. P. 56(c)(4); *Herzog v. Graphic Packaging Int'l, Inc.*, 742 F.3d 802, 805 n.1 (7th Cir. 2014).

**D. Second & Third Accommodation Requests; First EEOC Charge**

On August 11, 2016, Ms. Lane filed her second request for accommodation. [Filing No. 56-2 at 18; Filing No. 56-3 at 22.] Ms. Lane wrote as follows:

> I have Lupus and the heat causes my skin to itch and it makes me sleepy and tired. I need an air conditioned bus it doesn't permit me from performing my duties as a bus attendant. It's because the buses that Mr. Banner put me on doesn't have air conditioning. I can perform my duties very well with a bus that has air!

[Filing No. 56-3 at 22.] Ms. Lane also provided a statement from her doctor, who explained that Ms. Lane had "[s]ystemic lupus with kidney disease, chronic asthma" and "should not become dehydrated as this could worsen kidney function[;] asthma exacerbation." [Filing No. 56-3 at 23.] Further, the doctor explained that Ms. Lane should "remain in airconditioned environment to limit fluid loss from sweating and prevent dehydration and breathing difficulties." [Filing No. 56-3 at 23.]

The next day, August 12, 2016, Ms. Lane submitted an additional accommodation request. [Filing No. 56-3 at 24.] In the "Accommodation Requested" section of the form, Ms. Lane wrote: "Not being able to breathe is the only concern I have of performing my job, so having air conditioning on the bus to attend to kids so the driver can get us safely to and from school." [Filing No. 56-3 at 24.] Ms. Lane submitted a second doctor's statement with this request, which said that Ms. Lane had "[d]ifficulty breathing in heat" due to lupus and lung and breathing issues. [Filing No. 56-3 at 25.] The doctor recommended that Ms. Lane be accommodated with "[a]ir on [b]us." [Filing No. 56-3 at 7.]

Ms. Lane filed her first EEOC charge on August 18, 2016, alleging disability discrimination. [Filing No. 56-3 at 40.] In relevant part, Ms. Lane alleged:

I am a qualified individual with a disability. My position is bus attendant. I have had the disability my entire employment. Due to my disability, I require a bus with air conditioning as an accommodation. In the past, I was assigned to a bus with air conditioning; however, this year I was assigned to a bus with no air conditioning. I have provided IPS a written ADA accommodation request, including medical documentation certifying my disabilities and need for an air conditioned bus. However, on August 17, 2016 I was placed on unpaid leave and told not to return to work until September 14, 2016 when there will be a meeting regarding my accommodation request. Currently there are several buses with air conditioning that are not being used that IPS could use to accommodate me.

[Filing No. 56-3 at 40.] The EEOC issued Ms. Lane a right-to-sue letter on April 7, 2017. [Filing No. 56-3 at 41.]

IPS conducted a conference regarding Ms. Lane's accommodation requests on August 19, 2016. [Filing No. 56-2 at 22; Filing No. 56-3 at 26.] Ms. Lane, a union representative, a human resources official, and the ADA coordinator all attended. [Filing No. 56-3 at 26.] Among other things, the parties discussed the availability of airconditioned buses and the possibility that Ms. Lane could work at the transportation base if no airconditioned buses were available. [Filing No. 56-2 at 22.] IPS requested additional information regarding the temperatures at which Ms. Lane could safely work and agreed to temporarily assign Ms. Lane to an airconditioned bus in the meanwhile. [Filing No. 56-2 at 22-23; Filing No. 56-3 at 26-30.] Ms. Lane was immediately reassigned to the airconditioned bus. [Filing No. 56-2 at 22-23; Filing No. 56-3 at 26-30.]

Opportunities for airconditioned buses were limited because IPS upgraded its fleet in July 2016 with new propane buses that did not have air conditioning. [Filing No. 56-1 at 5.] Buses for students with special needs were the only buses with air conditioning remaining in regular service. [Filing No. 56-1 at 5.] Moreover, because of the seniority route-bidding procedure in place, IPS had to collaborate with the union before it could move another employee from an assigned route. [Filing No. 56-1 at 6.]

### E. September 2016 Relocation to Non-airconditioned Bus

As part of the ongoing replacement of older diesel buses, Ms. Lane was moved out of the airconditioned bus on September 12, 2016 and into a newer, non-airconditioned bus serving the

same route.  [Filing No. 56-2 at 22-23.]  Ms. Lane remained on this bus until she was fired on May 19, 2017.  [Filing No. 56-2 at 24; Filing No. 56-1 at 7.]

When she was switched to the non-airconditioned bus, Ms. Lane told Assistant Base Supervisor David Banner about her need for air conditioning.  [Filing No. 56-2 at 24.]  Mr. Banner referred Ms. Lane to Base Supervisor Lee Powell, who in turn referred her to the individual who had handled Ms. Lane's accommodation process, Operations Manager Detra Taylor.  [Filing No. 56-2 at 24-25.]

Ms. Lane did not follow up with Ms. Taylor and did not raise the accommodation issue again until the spring of 2017.  [Filing No. 56-2 at 24.]  Moreover, Ms. Lane did not have any issues with her asthma, lupus, or other conditions during the fall months of 2016 because of mild ambient temperatures.  [Filing No. 56-2 at 22; Filing No. 56-2 at 27; *see also* Filing No. 69 at 5 (setting forth unchallenged assertions regarding mild temperatures in fall 2016).]

### F.  November 2016 Discipline

On November 16, 2016, Ms. Lane failed to check the school bus for left-behind students after unloading at the school.  [Filing No. 56-2 at 9-10.]  Ms. Lane found a sleeping student on the bus after the bus returned to the base after the drop-off.  [Filing No. 56-2 at 9-10.]  Though IPS policy would have permitted IPS to terminate Ms. Lane for the incident, Ms. Lane instead received a weeklong suspension and a "Progressive Discipline Notice" indicating that it was her "Final Written Warning."  [Filing No. 56-3 at 10; Filing No. 56-2 at 9-10; Filing No. 56-1 at 5-6.]

### G.  April 2017 Accommodation Efforts

In April 2017, with the weather beginning to heat up, Ms. Lane again spoke to Mr. Banner about her need for an airconditioned bus.  [Filing No. 56-2 at 40-41.]  Mr. Banner sent Ms. Lane to

Mr. Powell, who in turn told Ms. Lane to contact Ms. Taylor. [Filing No. 56-2 at 41.] Ms. Taylor told Ms. Lane to contact Mi'Kel Durall of human resources. [Filing No. 56-2 at 41.]

On April 13, 2017, Ms. Lane emailed Ms. Durall a note from her doctor explaining that Ms. Lane "has severe asthma and was told she needed to know exactly what degree the bus needed to be and it needs to be at 70º." [Filing No. 56-3 at 31.] Ms. Lane noticed a mistake in the doctor's note, as it should have indicated that she could not work without air conditioning in ambient temperatures of over 70 degrees. [Filing No. 56-2 at 27-28; Filing No. 56-2 at 41.] There was no requirement that her bus itself be at 70 degrees. [Filing No. 56-2 at 27-28; Filing No. 56-2 at 41.] At some point shortly after sending the doctor's note, Ms. Lane emailed Ms. Durall explaining that she would follow up with a corrected doctor's note. [Filing No. 56-2 at 27-28; Filing No. 56-2 at 41.] On May 3, 2017, Ms. Lane sent the corrected note from her doctor explaining that "[s]he should be accommodated in an air-conditioned bus if the outside temperature is over 70 degrees F." [Filing No. 56-3 at 32.]

Immediately upon receiving the April 13, 2017 note, Ms. Durall contacted other IPS employees responsible for ADA accommodations, including Director of Employee Relations Kenneth Pack and Director of Transportation Manuel Mendez. [Filing No. 56-1 at 6.] IPS was required to collaborate with the union to provide such an accommodation because, as explained above, bus assignments were determined by a seniority bidding procedure. [Filing No. 56-1 at 6.] Mr. Mendez began the collaborative process with the union. [Filing No. 56-1 at 6.] No evidence suggests that IPS considered placing Ms. Lane at the transportation base, an accommodation it had suggested during the August 19, 2016 ADA conference. [*See* Filing No. 56-2 at 22.]

### H. April 2017 Absences

Ms. Lane missed work on several occasions in April 2017. Before Ms. Lane provided the doctor's note on April 13, 2017, which restarted the accommodation process, Ms. Lane missed the morning shifts on sick leave on April 11 and 13. [Filing No. 56-1 at 12; Filing No. 56-2 at 40.] Ms. Lane also missed a whole day of work on April 19 and the morning shifts on April 20 and 26. [Filing No. 56-2 at 40; Filing No. 56-3 at 38.] Ms. Lane could not remember whether she missed these shifts due to the temperature, and she was paid for all of her missed sick days. [Filing No. 56-2 at 40.]

### I. Second EEOC Charge

On May 2, 2017, Ms. Lane filed her second EEOC charge, alleging discrimination based on retaliation and disability. [Filing No. 56-3 at 42.] Ms. Lane alleged as follows:

> I filed EEOC Charge 470-2016-02686 regarding Respondent's failure to accommodate my disabilities. The Respondent is well aware of my disabilities and need for accommodation. Last year, after obtaining my doctor's recommendation that I not work on a bus without air conditioning when the ambient temperature is 70 degrees or above, Respondent finally provided an air conditioned bus for me to ride. Last month, April 2017, there were at least 8 days in which the ambient temperature was 70 degrees or more. Although Respondent knows I need an accommodation, I communicated my need for an air conditioned bus to Mr. Powell, Mr. Banner, Ms. Taylor, and Ms. Durral, but they were unresponsive to my accommodation requests. On April 19, 2017, after several accommodation requests were not approved, I had to take time off work because it was so hot. Respondent has air conditioned buses available, but refuses to accommodate me.

[Filing No. 56-3 at 42.] The EEOC issued Ms. Lane a right-to-sue letter on August 30, 2017. [Filing No. 56-3 at 41.]

### J. May 8, 2017 Incident & Termination

On May 8, 2017, the driver for Ms. Lane's bus reported that Ms. Lane had hit a student during her shift. [Filing No. 56-1 at 7.] IPS immediately reviewed surveillance footage from the bus and confirmed that, after slapping the seat of a sleeping student, Ms. Lane hit the student's shoulder. [Filing No. 56-1 at 7.] This is in fact what the video depicts, [*see* Filing No. 61], and, at her deposition, Ms. Lane admitted to hitting the student on the shoulder, [Filing No. 56-2 at 32]. This conduct violated IPS policies. [Filing No. 56-1 at 7.]

On May 11, 2017, Mr. Banner and Mr. Powell told Ms. Lane that she was suspended pending further investigation. [Filing No. 56-2 at 32.] On May 18, 2017, Mr. Pack and Mr. Mendez told Ms. Lane that they were recommending her termination. [Filing No. 56-3 at 33-35.] Mr. Mendez made the ultimate decision in consultation with Mr. Pack and Ms. Taylor. [Filing No. 76-3 at 3.] On May 19, 2017, IPS Superintendent Louis Ferebee accepted the recommendation and fired Ms. Lane. [Filing No. 56-3 at 36; Filing No. 56-1 at 7.]

At some point in February 2016, another bus driver saw a bus attendant named Larry Collins hit a student. [Filing No. 72-7 at 1.] The driver reported the incident to his supervisor. [Filing No. 72-7 at 1.] Mr. Collins continued to work as a bus attendant, though neither the bus driver nor Ms. Lane know whether Mr. Collins received any discipline. [Filing No. 72-7 at 1; Filing No. 56-2 at 48-49.] Neither Mr. Pack, Mr. Mendez, nor Ms. Taylor, the three decision makers who ultimately recommended Ms. Lane's termination, had any knowledge of Mr. Collins' conduct, and Mr. Pack and Mr. Mendez were not employed by IPS at the time that incident occurred. [Filing No. 56-1 at 7; Filing No. 76-2 at 3-4; Filing No. 76-3 at 2-3.]

### K. Procedural History

Ms. Lane, originally proceeding *pro se*, filed this lawsuit on September 19, 2017. [Filing No. 1.] Counsel filed an appearance for Ms. Lane on December 1, 2017, [Filing No. 15], and, after the Court ruled on a Motion to Dismiss, [Filing No. 25], filed the currently-operative Amended Complaint on February 22, 2018, [Filing No. 30]. Though styled as only two counts, Ms. Lane's Amended Complaint alleges four claims under the Americans with Disabilities Act ("ADA"): 1) failing to accommodate Ms. Lane with an assignment to an airconditioned bus, 2) reducing Ms. Lane's pay when she was transferred to the bus attendant position, 3) subjecting Ms. Lane to a hostile work environment, and 4) firing Ms. Lane in retaliation for filing her second EEOC Charge.

[Filing No. 30 at 4-5.]  On September 7, 2018, IPS filed its Motion for Summary Judgment on all claims raised in Ms. Lane's Amended Complaint.  [Filing No. 56.]  IPS's Motion is fully briefed and ripe for decision.

### III.
### DISCUSSION

IPS raises several arguments as to why each of Ms. Lane's claims fail.  First, IPS argues that any discrimination claims based upon her reduced pay and harassment (hostile work environment) fail because they were not included in her second EEOC charge.  [Filing No. 57 at 14-15.]  Relatedly, IPS argues that any allegations contained in Ms. Lane's first EEOC charge are barred for failure to file suit within the allotted time.  [Filing No. 57 at 14.]  Second, IPS argues that each of Ms. Lane's discrimination theories fails because Ms. Lane is not disabled.  [Filing No. 57 at 16-17.]  Third, IPS argues that even if Ms. Lane's pay reduction claim were exhausted, it would fail for lack of evidence of discriminatory animus.  [Filing No. 57 at 16-18.]  Fourth, IPS argues that even if Ms. Lane's hostile work environment claim were exhausted, it, too, would fail for lack of evidence.  [Filing No. 57 at 18-20.]  Fifth, IPS argues that Ms. Lane's failure-to-accommodate claim fails because it provided her with all appropriate accommodations.  [Filing No. 57 at 20-22.]  Finally, IPS argues that Ms. Lane's retaliation claim fails for lack of evidence. [Filing No. 57 at 22-25.]

The Court addresses each of these arguments in turn.

**A.  Procedural Issues**

IPS first argues that Ms. Lane's pay and hostile work environment claims fail because they were not raised in her second EEOC charge and that any claims raised in her first EEOC charge are time-barred.  [Filing No. 57 at 14.]  In response, Ms. Lane argues that her general allegations of discrimination encompass the hostile work environment.  [Filing No. 69 at 9-10.]  Ms. Lane

also argues that, because she continued to be paid less as a bus attendant, her allegation of "retaliation" in her second charge suffices to exhaust her pay reduction claim. [Filing No. 69 at 10.] Ms. Lane does not respond to the argument that any claim in her first EEOC charge is time-barred. IPS reiterates its arguments on reply and further argues that the pay-reduction claim, even if raised in the second EEOC charge, would fail because the pay cut occurred more than 300 days before Ms. Lane filed her second EEOC charge. [Filing No. 77 at 8-10.]

As an initial matter, Ms. Lane did not respond to IPS's argument that any claim based upon the first EEOC charge is time barred for failure to file a lawsuit within 90 days after receipt of the right to sue letter. *See, e.g.*, *Houston v. Sidley & Austin*, 185 F.3d 837, 838-39 (7th Cir. 1999) ("Under the ADA, . . . a plaintiff must file her suit within 90 days from the date the EEOC gives notice of the right to sue."); 42 U.S.C. § 2000e-5(f)(1). Taking Ms. Lane's silence as a concession on the issue, the Court **GRANTS** summary judgment in IPS's favor to the extent Ms. Lane alleges claims based upon the first EEOC charge.

Whether Ms. Lane succeeded in exhausting administrative remedies for her pay discrimination and hostile work environment claims in her second EEOC charge turns on whether the claims were "reasonably related" to the other claims raised in the charge such that they would be "expected to develop from an investigation into the charges actually raised." *Riley v. City of Kokomo*, 909 F.3d 182, 189 (2018) (internal quotation omitted). While no magic words are required to meet this standard, *see Huri v. Office of the Chief Judge of the Circuit Court of Cook Cnty.*, 804 F.3d 826, 832 (7th Cir. 2015) (noting that omission of the phrase "hostile work environment" was not determinative), at a minimum, the EEOC charge and civil complaint must "describe the same conduct and implicate the same individuals." *Whitaker v. Milwaukee Cnty.*, 772 F.3d 802, 813 (7th Cir. 2014) (internal quotation and emphasis omitted). It is not enough for

a plaintiff to simply check a particular box on the EEOC charge form and then later allege that an omitted claim falls within the category of claims covered by the checked box. For example, while "[f]ailure to accommodate is a form of ADA discrimination," *Hooper v. Proctor Health Care Inc.*, 804 F.3d 846, 851 (7th Cir. 2015), the Seventh Circuit has held that an EEOC charge alleging a discriminatory termination claim does not automatically exhaust a failure to accommodate claim, *Riley*, 909 F.3d at 190 (citing *Green v. Nat'l Steel Corp.*, 197 F.3d 894, 898 (7th Cir. 1999)). Similarly, in *Cheek v. Western & Southern Life Insurance Co.*, the Seventh Circuit observed in the sex discrimination context that "[b]ecause an employer may discriminate on the basis of sex in numerous ways, a claim of sex discrimination in an EEOC charge and a claim of sex discrimination in a complaint are not alike or reasonably related just because they both assert forms of sex discrimination." 31 F.3d 497, 501 (7th Cir. 1994). The same holds true in the ADA context. *See Riley*, 909 F.3d at 190.

By way of review, Ms. Lane's second EEOC charge checked the boxes for retaliation and disability and alleged as follows:

> I filed EEOC Charge 470-2016-02686 regarding Respondent's failure to accommodate my disabilities. The Respondent is well aware of my disabilities and need for accommodation. Last year, after obtaining my doctor's recommendation that I not work on a bus without air conditioning when the ambient temperature is 70 degrees or above, Respondent finally provided an air conditioned bus for me to ride. Last month, April 2017, there were at least 8 days in which the ambient temperature was 70 degrees or more. Although Respondent knows I need an accommodation, I communicated my need for an air conditioned bus to Mr. Powell, Mr. Banner, Ms. Taylor, and Ms. Durral, but they were unresponsive to my accommodation requests. On April 19, 2017, after several accommodation requests were not approved, I had to take time off work because it was so hot. Respondent has air conditioned buses available, but refuses to accommodate me.

[Filing No. 56-2 at 42.] Her Amended Complaint, however, alleged that "Lane's pay was reduced despite an IPS policy that allowed drivers who transferred to bus attendant positions to retain their driver's pay rate, and despite the fact that similarly-situated drivers who were not disabled . . . who transferred to bus attendant positions did retain their driver's rate of pay following the transfer."

[Filing No. 30 at 2.]  It also alleged that "IPS's actions create subject [sic] Lane to a hostile work environment based on his [sic] disability . . . ."  [Filing No. 30 at 4.]

The second EEOC charge makes no mention of the reduction in pay or of the hostile or abusive workplace raised in the Amended Complaint.  Though even on summary judgment Ms. Lane's hostile work environment is not well defined, the EEOC charge's allegation regarding her need for accommodations and IPS's refusal to accommodate are not the kind of allegations that "describe the same conduct" that would give rise to a hostile work environment.  *Whitaker*, 772 F.3d at 813 (internal quotation and emphasis omitted).  Moreover, as explained in cases such as *Riley* and *Cheek*, Ms. Lane is incorrect to suggest that by alleging one form of discrimination she has exhausted her claims for other, unrelated forms of discrimination.

*Huri*, the sole case Ms. Lane relies upon, confirms that her efforts to exhaust her harassment and disparate pay claims fall short.  In that case, the Seventh Circuit held that a plaintiff need not use the words "hostile work environment" to raise a hostile work environment claim.  804 F.3d at 832.  But in *Huri*, the plaintiff alleged that she suffered continued "harassment," despite her complaints.  *Id.*  As the court observed, "Given Huri's inclusion of nationality- and religion-based harassment in the her [sic] first EEOC charge, her employers had no reason to be surprised by her Title VII hostile work environment allegations covering her time as a child care attendant."  *Id.* Here, in contrast, Ms. Lane's second EEOC charge makes no reference to any conduct that would give rise to a hostile work environment as opposed to a refusal to accommodate.  As a result, IPS had no reason to examine at the agency stage whether Ms. Lane had endured impermissible harassment or other hostile conduct.  Thus, as with her discriminatory pay claim, Ms. Lane has failed to exhaust her hostile work environment claim.

As described above, Ms. Lane failed to file a lawsuit within 90 days of receiving her first right-to-sue letter. Any claim based upon her first EEOC charge is therefore time-barred. Additionally, Ms. Lane failed to raise her pay discrimination and hostile work environment claim in her second EEOC charge. The Court therefore **GRANTS** IPS's Motion for Summary Judgment as to these claims.

### B. Disabled Under the ADA

IPS argues that all of Ms. Lane's disability discrimination theories (failure to accommodate, pay reduction, and hostile work environment) fail because Ms. Lane is not disabled under the ADA. [Filing No. 57 at 16-17.] In response, Ms. Lane argues that IPS confuses the issue that Ms. Lane is a qualified individual under the ADA. [Filing No. 69 at 11-12.] IPS does not address Ms. Lane's argument in reply.

All of Ms. Lane's disability discrimination claims require her to show that she is a qualified person with a disability as defined in the ADA. *Guzman v. Brown Cnty.*, 884 F.3d 633, 641-42 (7th Cir. 2018). A "qualified individual" is one who "satisfies the prerequisites for the position" and who can "perform the essential functions of the job with or without reasonable accommodation." *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 241-42 (7th Cir. 2018). "Under the ADA, a 'reasonable accommodation' may include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, ... the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.'" *Stern v. St., Anthony's Health Ctr.*, 788 F.3d 276, 288 (7th Cir. 2015) (quoting 42 U.S.C. § 12111(9)(B)).

On summary judgment, IPS does not challenge Ms. Lane's status as a qualified individual, and the evidence in the light most favorable to Ms. Lane suggests that she could act as a bus

attendant on an airconditioned bus when the ambient temperature was above 70 degrees or could work at the transportation base. Rather, IPS challenges Ms. Lane's status as a "person with a disability." The ADA explains that "'disability' means, with respect to an individual[,] a physical or mental impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1). "[M]ajor life activities," in turn, include things as diverse as "lifting," "breathing," "working," and issues with "the operation of a major bodily function, including but not limited to, functions of the immune system" and "respiratory . . . functions." *Id.* § 12102(2).

Ms. Lane has provided ample evidence to avoid summary judgment on the disability issue, including her lupus diagnosis and doctors' opinions that riding in warm buses could exacerbate her conditions, including her asthma. These opinions, which the Court must credit at this juncture, reflect substantial limitations in the operation of her immune system and the major life function of breathing, among other things. The Court therefore **DENIES** IPS's Motion for Summary Judgment as it pertains to the disability element of Ms. Lane's discrimination claims.

### C. Disparate Pay Claim

Alternatively addressing Ms. Lane's unexhausted disparate pay claim on the merits, IPS contends that Ms. Lane's disparate pay claim fails because Ms. Lane has failed to present any evidence tying her loss of pay when she went from bus driver to bus attend to her disability. [Filing No. 57 at 16-18.] In response, Ms. Lane points to Ms. Shelton's affidavit, which states that she represented Mr. Stamps in negotiations and that he retained his driver's pay when he was transferred to a bus attendant position. [Filing No. 69 at 13.] In reply, IPS argues that Ms. Shelton's conclusory affidavit fails to create a genuine issue of fact in light of the business record it has offered and authenticated showing that Mr. Stamps' salary was reduced from $16.06 an hour to $12.22 an hour.

[Filing No. 77 at 10-12 (citing Filing No. 76-1 at 2-3).] Ms. Lane did not file a surreply to address this new evidence.

To succeed on her disparate pay claim, Ms. Lane must show that she is a qualified person with a disability who "suffered from an adverse employment decision as a result of her disability." *Guzman*, 884 F.3d at 641. A reduction of pay counts as an adverse employment action. *See, e.g.*, *Timmons v. Gen. Motors Corp.*, 469 F.3d 1122, 1128 (7th Cir. 2006). At issue is whether Ms. Lane has produced enough evidence "suggesting [IPS's] decision to [reduce Ms. Lane's pay] was based on [her] disability rather than some other job-related reason." *Id.* at 1129. And evidence that "similarly situated employees outside of the protected group systematically receive better treatment" is one type of circumstantial evidence that can raise the reasonable inference that such a pay cut was due to a disability instead of a legitimate reason. *Bunn v. Khoury Enter., Inc.*, 753 F.3d 676, 684 (7th Cir. 2014) (internal quotation omitted).

In this case, as explained above, the entirety of Ms. Lane's evidence of disparate treatment consists of Ms. Shelton's statement regarding Mr. Stamps' pay. That statement provides as follows: "My representation of Stamp [sic] [as a union representative] included negotiations that allowed him to retain his bus driver's pay after becoming a bus attendant." [Filing No. 72-6 at 1.] In reply, IPS provided a printout of Mr. Stamps' employment record demonstrating that his pay had been reduced. [Filing No. 77 at 10-12 (citing Filing No. 76-1 at 2-3).] Ms. Lane, as the nonmoving party, is entitled to all *reasonable* inferences in her favor. The question is therefore whether Ms. Shelton's affidavit could convince "a reasonable jury [to] return a verdict for the nonmoving party." *Bunn*, 753 F.3d at 682.

The Court concludes that Ms. Shelton's affidavit raises no more than a "metaphysical doubt" regarding the accuracy of the documents proffered by IPS and so fails to demonstrate a

*genuine* issue of fact regarding whether Mr. Stamps' pay was reduced. *Carroll v. Lynch*, 698 F.3d 561, 565 (7th Cir. 2012) (internal quotation omitted). First, unlike the detailed records provided by IPS, Ms. Shelton's affidavit states in conclusory terms that Mr. Stamps was allowed to keep his pay without any underlying facts regarding how this came to be or how she knew it to be true (aside from her status as Mr. Stamps' representative). *Cf., e.g.*, *Steinhauer v. DeGolier*, 359 F.3d 481, 484 n.1 (7th Cir. 2004); *Burks v. Wisc. Dep't of Transp.*, 464 F.3d 744, 752 n.6 (7th Cir. 2006). Second, under Local Rule 56-1, Ms. Lane had the right to file a surreply to contest IPS's new evidence. S.D. Ind. L.R. 56-1(d). In failing to do so, Ms. Lane has "forfeit[ed] the use of evidence" that may have "bolster[ed] some of [her] claims." *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017). For example, Ms. Lane could have contested the accuracy of the employment records or provided details about Ms. Shelton's representation of Mr. Stamps and her knowledge of Mr. Stamps' pay. But as it stands, no reasonable jury could credit Ms. Shelton's conclusory statement in the face of IPS's unchallenged employment records demonstrating that Mr. Stamps' pay was reduced when he was transferred from bus driver to bus attendant.

As a consequence, Mr. Stamps cannot serve as a valid comparator—both Mr. Stamps and Ms. Lane received substantially similar pay cuts when they transferred positions. Ms. Lane offers no other evidence or arguments in support of her disparate pay claim. The Court therefore **GRANTS** IPS's Motion for Summary Judgment as to Ms. Lane's unexhausted disparate pay claim for this additional reason.

### D. Hostile Work Environment Claim

Again in the alternative, IPS argues that Ms. Lane's hostile work environment claim fails on its merits because Ms. Lane has failed to establish that her work environment was objectively and subjectively offensive, that the conduct was severe or pervasive, or that the conduct occurred

on account of her disability. [Filing No. 77 at 12-14.] In response, Ms. Lane argues that the combination of a "false[]" accusation of being accused of hitting a student, the reduction of pay, the removal from the air conditioned bus, and the termination combine to demonstrate a severe or pervasive hostile work environment on account of her disability. [Filing No. 69 at 14-17.] In reply, IPS argues that Ms. Lane has merely repackaged her other discrimination and retaliation claims into a hostile work environment claim. [Filing No. 77 at 12-14.]

As IPS points out, the Seventh Circuit has not explicitly determined whether hostile work environment claims are cognizable under the ADA. *See, e.g.*, *Lloyd v. Swifty Transp., Inc.*, 552 F.3d 594, 603 (7th Cir. 2009). Rather, courts have assumed that they are and then proceeded to examine (and grant summary judgment on) the claims under the familiar Title VII test for hostile work environment claims. *See, e.g.*, *id.*; *Shott v. Rush Univ. Med. Ctr.*, 652 F. App'x 455, 458 (7th Cir. 2016). Under this test, the plaintiff must provide evidence showing "(1) the work environment was both objectively and subjectively offensive; (2) the harassment was based on membership in a protected class . . . ; (3) the conduct was severe or pervasive; and (4) there is a basis for employer liability." *Boss v. Castro*, 816 F.3d 910, 919-20 (7th Cir. 2016). Considering the "totality of the circumstances," evaluating whether a workplace is hostile requires the Court to assess factors such as "the frequency of improper conduct, its severity, whether it is physically threatening or humiliating (as opposed to a mere offensive utterance), and whether it unreasonably interferes with the employee's work performance." *Id.* at 920 (internal quotation omitted).

Ms. Lane has failed to meet her burden of demonstrating a genuine issue of material fact as to whether the environment was objectively offensive and the conduct severe or persuasive. As another district judge aptly observed, "It appears that [Ms. Lane] is trying to equate a failure to provide a reasonable accommodation with a hostile environment, an equation that finds no support

in the facts or the law." *Erjavac v. Holy Family Health Plus*, 13 F. Supp. 2d 737, 752 (N.D. Ill. 1998). This observation rings true in this case. Moreover, several of "incidents" to which Ms. Lane cites lack evidentiary support. Ms. Lane's claim that she was "falsely" accused of hitting a student is flatly contradicted by the record. In fact, Ms. Lane admitted to hitting the student at her deposition and the video evidence conclusively shows her doing so. As discussed in the preceding section, no evidence links Ms. Lane's reduction in pay with her position transfer to her disability. That incident, too, does not provide any support for Ms. Lane's hostile work environment claim. While the Court will address the issue in depth below, Ms. Lane also has failed to provide any evidence connecting her termination to her disability. In sum, Ms. Lane has offered a smattering of ordinary complaints regarding work life, most of which have no evidentiary connection to her disability. The Court therefore **GRANTS** IPS's Motion for Summary Judgment as to Ms. Lane's unexhausted hostile work environment claim on this additional basis.

### E. Failure to Accommodate

IPS next argues that it is entitled to summary judgment on Ms. Lane's failure to accommodate claim, arguing that it "work[ed] diligently to place [Ms.] Lane on an air-conditioned bus and/or provide her with a different reasonable accommodation," but that these efforts were cut short by Ms. Lane's termination for hitting a student. [Filing No. 57 at 20-22.] IPS argues that the "confusing and inaccurate note" regarding the bus temperature contributed to the delay in accommodations. [Filing No. 57 at 20.] In response, Ms. Lane argues that IPS's insistence that it needed more documentation for Ms. Lane's temperature threshold does not make sense because IPS would not have assigned Ms. Lane to a bus only on certain days. [Filing No. 69 at 17-18.] Ms. Lane also argues that the first note should have placed IPS on reasonable notice of her need for an accommodation and that IPS failed to address the possibility of assigning Ms. Lane to the

transportation base, as it had previously contemplated.  [Filing No. 69 at 18-19.]  In reply, IPS argues that it was entitled to ask for the additional medical documentation and that it was Ms. Lane who informed IPS that her initial doctor's note needed to be corrected.  [Filing No. 77 at 16-17.]

To survive summary judgment, Ms. Lane must show that "(1) she is a qualified individual with a disability; (2) her employer was aware of this disability; and (3) her employer failed to reasonably accommodate the disability."  *Guzman*, 884 F.3d at 642.  At issue here is the third element.  "After an employee has disclosed that she has a disability, the ADA requires an employer to engage with the employee in an interactive process to determine the appropriate accommodation under the circumstances."  *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1061 (7th Cir. 2014) (internal quotation omitted).  The failure to engage in this process "alone is not an independent basis for liability," though it is "actionable if it prevents identification of an appropriate accommodation for a qualified individual."  *Id.* at 1062 (internal quotation omitted).  "[W]hen an employer takes an active, good-faith role in the interactive process, it will not be liable if" the ultimate failure to accommodate is due to the employee's lack of participation in the process or failure to provide "essential information."  *E.E.O.C. v. Sears, Roebuck & Co.*, 417 F.3d 789, 806 (7th Cir. 2005).

Before assessing whether IPS made a reasonable effort to accommodate (IPS does not dispute that Ms. Lane was not in fact accommodated before her termination), the Court revisits the timeline of the most salient facts:

- On August 11, 2016, Ms. Lane filed a request for accommodation, supported with medical documentation, explaining that she needed an air-conditioned bus to accommodate her lupus.  [Filing No. 56-3 at 22-25.]

- On August 19, 2016, IPS conducted a conference with Ms. Lane and agreed that Ms. Lane would be temporarily assigned to an airconditioned bus while Ms. Lane provided additional documentation regarding the temperatures at which she could safely work. [Filing No. 56-2 at 22-23; Filing No. 56-3 at 26-30.] The parties additionally stated that Ms. Lane could work at the transportation base if no airconditioned buses were available. [Filing No. 56-2 at 22.]

- On September 12, 2016, Ms. Lane was moved off of the airconditioned bus. [Filing No. 56-2 at 22-23.] Ms. Lane complained and mentioned her required accommodation. [Filing No. 56-2 at 24.] Mr. Banner referred Ms. Lane to Mr. Powell who referred her to Ms. Taylor. [Filing No. 56-2 at 24-25.]

- Ms. Lane did not follow up with anyone regarding her accommodation or have any health problems relating to heat until she again spoke to Mr. Banner in April 2017. [Filing No. 56-2 at 40-41.] Again, Ms. Lane was referred up the chain of command.. [Filing No. 56-2 at 41.]

- On April 13, 2017, Ms. Lane emailed Ms. Durall a doctor's note explaining that the bus needed to be 70 degrees. [Filing No. 56-3 at 31.] Immediately upon receiving the note, Ms. Durall contacted others involved in the ADA process, including Mr. Mendez, who began to work with the union on moving Ms. Lane to an airconditioned bus. [Filing No. 56-1 at 6.] Ms. Lane told Ms. Durall that a corrected doctor's note would be forthcoming. [Filing No. 56-2 at 27-28; Filing No. 56-2 at 41.]

- On May 3, 2017, Ms. Lane sent Ms. Durall the corrected doctor's note explaining that Ms. Lane needed air conditioning when the ambient temperature was over 70 degrees. [Filing No. 56-3 at 32.]

- On May 8, 2017, Ms. Lane hit a student on the shoulder. [Filing No. 61.] Ms. Lane was immediately suspended and eventually terminated on May 19, 2017. [Filing No. 56-3 at 36; Filing No. 56-1 at 7.]

Ms. Lane does not claim that she needed the accommodation between September 12, 2016, when she was moved off of the bus, and April 13, 2017, when she sent Ms. Durall the requested medical documentation. [Filing No. 56-2 at 39, 43-44.] Therefore, the only period relevant to her claim is the narrow timeframe between April 13, 2017, when Ms. Lane sent Ms. Durall the requested medical documentation, and May 8, 2017, when Ms. Lane was properly suspended and then terminated for hitting a student.

Based on this timeline, and drawing all reasonable inferences in Ms. Lane's favor, the Court concludes that a genuine issue of material fact exists as to whether IPS failed to accommodate Ms. Lane between April 13, 2017 and May 8, 2017. The Court reaches this conclusion for several reasons. First, while IPS makes much ado regarding the first "confusing" doctor's note, it also proffers evidence showing that it knew exactly what Ms. Lane needed. Ms. Durall immediately reached out to others involved in the ADA process, and Mr. Mendez immediately began to work with the union on finding an airconditioned bus. Based upon this conflicting evidence, the Court rejects IPS's implied argument that Ms. Lane's first letter was not clear enough to warrant an accommodation, at least when viewed in the light most favorable to Ms. Lane. The Court likewise rejects any implied argument that IPS was entitled to wait for the second letter because of its right to request medical documentation. It was Ms. Lane who informed IPS that more evidence was forthcoming; IPS did not request it. Second, IPS does not respond to Ms. Lane's argument that she should have been accommodated by a temporary assignment at the transportation base, an accommodation that had previously been suggested by IPS. If IPS believed

that this accommodation unavailable or impracticable for some reason, it should have presented evidence to that effect. Finally, while not sufficient to defeat summary judgment on its own, the Court notes that IPS supports the sufficiency of its accommodation efforts with the conclusory affidavit of Mr. Mendez, which lacks any details as to IPS's efforts to work with the union. IPS was undoubtedly entitled to some period of time to work with the union on how to accommodate Ms. Lane. But, given the ignored possibility of working on the transportation base, the adequacy of IPS's accommodation efforts must be determined by a jury.

Again, however, the Court reiterates that this is an extremely narrow failure-to-accommodate claim that survives summary judgment. For one, the undisputed evidence is that Ms. Lane did not lose any pay from the failure to accommodate. Ms. Lane did not remember whether she missed days between April 13 and May 8 due to the heat, and even if she had, she admitted that she received full compensation due to her sick leave. And, as addressed more fully below, the duty to accommodate ceased when Ms. Lane was terminated for hitting a student. Thus, while the Court **DENIES** summary judgment as to Ms. Lane's failure-to-accommodate claim, it does so while emphasizing these constraints.

### F. Retaliation

Finally, IPS argues that Ms. Lane's retaliation claim fails for a variety of reasons—the most important of which is that neither of the decision makers in Ms. Lane's case were involved in the alleged discipline of Ms. Lane's lone comparator.[3] [Filing No. 77 at 17-19.] Ms. Lane argues that Mr. Collins was not terminated despite hitting a student and that "other harassment" demonstrates that Ms. Lane was fired not because she hit a student, but because she filed her second EEOC charge. [Filing No. 69 at 19-20.]

---

[3] Given the result of this claim, the Court need not address IPS's additional arguments.

"To prove a retaliation claim, a plaintiff must prove (1) [s]he engaged in a statutorily protected activity; (2) [s]he suffered an adverse action; and (3) a causal connection between the two." *Koty v. DuPage Cnty.*, 900 F.3d 515, 519 (7th Cir. 2018). The lone issue is whether Ms. Lane was fired because she hit a student, or because she engaged in the protected activity of filing an EEOC charge. To support her claim that her EEOC charge caused her termination, Ms. Lane offers Mr. Collins as a comparator, whom she alleges also hit a student, but was not fired. But a plaintiff, "at a minimum," must demonstrate "that a comparator was treated more favorably by the same decision-maker who fired the plaintiff." *Coleman v. Donahoe*, 667 F.3d 835, 848 (7th Cir. 2012).

Here, the three decision makers who terminated Ms. Lane did not know anything about the alleged conduct of Mr. Collins and were not involved in his discipline. [Filing No. 56-1 at 7; Filing No. 76-2 at 3-4; Filing No. 76-3 at 2-3.] Mr. Mendez, the ultimate decision maker, and Mr. Pack were not even employed by IPS at the time the incident with Mr. Collins occurred. The undisputed evidence demonstrates that Mr. Collins was not treated more favorably by the decision makers who terminated Ms. Lane. And in light of the clear video evidence showing that Ms. Lane hit a student in the shoulder, no reasonable jury could conclude that Ms. Lane was terminated for her protected activity. The Court therefore **GRANTS** IPS's Motion for Summary Judgment as to Ms. Lane's retaliation claim.

## IV.
### CONCLUSION

Most of Ms. Lane's ADA claims are barred for failure to exhaust administrative remedies or fail for lack of evidence. While far from overwhelming, and the scope of recovery limited, her failure-to-accommodate claim has sufficient support to survive summary judgment. Therefore, the Court **GRANTS** IPS's Motion for Summary Judgment [56] as to Ms. Lane's claims for

disparate pay, hostile work environment, and retaliation. The Court **DENIES** IPS's Motion as to Ms. Lane's narrow failure-to-accommodate claim regarding the period between April 13, 2017 and May 8, 2017.

The Court requests that the Magistrate Judge confer with the parties to explore the possibility of resolving the sole remaining claim via negotiated resolution.

Date: 2/13/2019

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

**Distribution via ECF only to all counsel of record**